UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JUNHE QIU,
    Plaintiff,

Case No. 1:18-cv-634
Litkovitz, M.J.

vs.

UNIVERSITY OF CINCINNATI et al.,
    Defendants.

**ORDER**

This matter is before the Court on plaintiff Junhe Qiu's emergency motion for a temporary restraining order (Doc. 2), the University's response in opposition (Doc. 6), and plaintiff's reply memorandum (Doc. 8). The Court held a hearing in this matter on September 18, 2018. For the reasons stated below, plaintiff's motion is **DENIED**.

**I. Background Facts**

Plaintiff, an international student from China, enrolled in the undergraduate program at the University of Cincinnati's College-Conservatory of Music ("CCM") in August 2016 on a music scholarship. (Doc. 1, Complaint at ¶¶ 3, 18; Affidavit of Junhe Qiu, Doc. 2-1 at ¶ 1). Plaintiff majored in violin performance and became a member of the CCM Concert Orchestra. (Qiu Affidavit at ¶¶ 3-4).

Plaintiff suffers from a heart condition. In November 2014, plaintiff had heart surgery in China after he collapsed during a music festival in Europe. (*Id.* at ¶ 6). The heart condition was not successfully treated and persisted when plaintiff began attending CCM. (*Id.*). Plaintiff began receiving treatment at the University of Cincinnati Health Arrythmia Center in October 2016. (*Id.*). On November 12, 2016, while practicing in the CCM orchestra rehearsal room, plaintiff collapsed and was transported to the emergency room where he was diagnosed with

syncope and collapse from a heart defect. (*Id.*). Two days later, plaintiff underwent surgery where an implant was placed in his chest. (*Id.*).

In the spring semester of 2017, plaintiff enrolled in a Music Theory 2 class with defendant Dr. Catherine Losada. (*Id.* at ¶¶ 8-9). On March 10, 2017, defendant Losada accused plaintiff of academic dishonesty by completing a homework assignment with the unauthorized use of her instructor's manual. (*Id.* at ¶ 9). Plaintiff alleges that he never had the instruction manual and the accusation is false. (*Id.*). Nevertheless, plaintiff signed an academic dishonesty confession form to avoid "more trouble" from defendant Losada. (*Id.*). A few weeks later, on March 28, 2017, defendant Losada accused plaintiff of academic dishonesty by again alleging that his answer was too similar to the model answer given in the instructor's manual. (*Id.* at ¶ 10). Plaintiff requested a hearing before the College Hearing Panel, which found him guilty of academic dishonesty. (*Id.*). Defendant Losada subsequently failed plaintiff from the course. (*Id.*).

Plaintiff did not attend the fall semester of 2017 at CCM because he returned to China for medical treatment. (*Id.* at ¶ 7). He returned to CCM for the spring semester of 2018. (*Id.* at ¶ 11). On March 7, 2018, plaintiff passed out again during violin rehearsal and was taken to the emergency room where he was diagnosed with syncope, collapse, and sinus tachycardia. (*Id.*). Plaintiff reenrolled in Music Theory 2 class for the spring semester, which defendant Losada again taught. (*Id.*). On March 9, 2018, defendant Losada again accused plaintiff of academic dishonesty. (*Id.*). The allegation of academic misconduct described the incident as: "Using the instructor manual or other such source as a reference for the assignment due on Class no. 20." (Ex. A-5, Doc. 6-6 at 1). The recommended sanction for the misconduct was listed as

2

"Academic Disciplinary Dismissal." (*Id.*). Plaintiff "[d]en[ied] responsibility" and requested a hearing before the College Hearing Panel. (*Id.*).

On April 20, 2018, the College Hearing Panel held a hearing. (Affidavit of Stephanie Schlagel, Ex. A, Doc. 6-1 at ¶ 13). Plaintiff did not attend the hearing or notify University personnel of the reason for his absence. (*Id.*). Plaintiff alleges that he could not attend the hearing because of "violent chest pain which could be very dangerous to [his] life because of [his] previous heart condition and heart surgery." (Qiu Affidavit at ¶ 11). Plaintiff alleges that he was "forced to lie down in bed" and "had no strength to call to tell the Dean [he] was very sick." (*Id.*). In plaintiff's absence, the Panel found him responsible for cheating and recommended academic dismissal from the University. (Ex. A-5, Doc. 6-6 at 9).

Between April 25, 2018 and May 2, 2018, plaintiff exchanged emails with Aneisha K. Mitchell, Director of Student Conduct and Community Standards, and inquired about the proper procedure for appealing the Panel's decision. (Ex. A-6, Doc. 6-7 at 1-3). On May 3, 2018, plaintiff formally appealed the Panel's decision. (*Id.* at 4). On May 16, 2018, Christine Ackerman, University Appeals Administrator, reviewed plaintiff's appeal and concurred with the Panel's recommendation of dismissal from the University. (*Id.* at 5). On May 22, 2018, Dr. Kristi Nelson, Provost of the University, informed plaintiff that she had accepted the recommended sanction of dismissal from the University. (*Id.* at 7). Provost Nelson wrote: "[t]his is the final decision in the appeal process." (*Id.*).

Plaintiff testified that he spoke with Scott Lipscomb, Associate Dean of Academic Affairs at CCM,[1] sometime after May 22, 2018 to request a new hearing and explain that he missed the initial hearing due to chest pain exacerbated by his heart condition. Plaintiff also

---

[1] Scott Lipscomb served as the Associate Dean of Academic Affairs at CCM until May 20, 2018. (Schlagel Affidavit at ¶ 3).

3

explained these circumstances to Stephanie Schlagel, Interim Associate Dean of Academic Affairs, during an in-person meeting the week of May 22, 2018. (Ex. A-7, Doc. 6-8 at 1-3). On June 1, 2018, Dean Schlagel informed plaintiff that he exhausted all appeal options and the Provost's decision was final. (Schlagel Affidavit at ¶ 15). Plaintiff did not receive a new hearing and was dismissed from the University. (*Id.*).

Based on these facts, plaintiff brings claims under the Americans with Disabilities Act and the Rehabilitation Act, the Fourteenth Amendment for denial of due process, as well as claims of race, national origin, and color discrimination under federal and state law, and intentional infliction of emotional distress under state law. Plaintiff currently holds an F-1 visa issued by the United States Department of State, which is valid only if he remains in "duration of status" by being enrolled in classes at CCM in compliance with his I-20.[2] (Doc. 2 at 1). On September 6, 2018, plaintiff received an email from the University's International Services stating:

> According to the University registrar you are not enrolled for classes Fall Semester 2018. In order to maintain proper F-1 or J-1 immigration status within the U.S. you must be registered full time.
>
> \*
>
> \*
>
> \*
>
> You must clarify your registration status with us no later than 09/14/2018 (but the sooner the better). As you know, you are part of the Student and Exchange Visitor Information System (SEVIS). We are required to report your enrollment status to the Department of Homeland Security (DHS) on a Semesterly basis. If we have not heard back from you by 09/14/2018 we will have to report your lack of full time enrollment to the DHS.[3]

---

[2] Form I-20 is a Certificate of Eligibility for Nonimmigrant Student Status issued by the University of Cincinnati. (Doc. 1, Complaint at ¶ 3).
[3] Counsel for the University has represented to the Court that the UC International Services Office is not required to report plaintiff's enrollment status until September 26, 2018.

4

(Doc. 2-4). Thus, plaintiff seeks an Order enjoining the University from barring him from fulltime enrollment at CCM and enabling him to register and attend classes at CCM, which would allow him to remain in duration of status of his I-20 and maintain the lawful status of his F-1 student visa. (Doc. 2 at 1).

**II. Standard of Review**

Federal Rule of Civil Procedure 65 governs the proper procedures and requirements for the issuance of injunctions and temporary restraining orders ("TRO"). The purpose of a TRO is "to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). The same standard generally applies to temporary restraining orders and preliminary injunctions. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008); *Northeast Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

In determining whether to grant or deny emergency injunctive relief, the Court must consider four factors: (1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of an injunction. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689-90 (6th Cir. 2014); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). "These factors are not prerequisites which must be met, but are interrelated considerations that must be balanced together." *Northeast Ohio Coal. for Homeless*, 467 F.3d at 1010 (quoting *Mich. Coal of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). A TRO is an "extraordinary and drastic remedy" and should "only be awarded

5

upon a clear showing that the plaintiff is entitled to such relief." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848-49 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

**III. Analysis**

    **A. Likelihood of Success on the Merits**

Plaintiff must first prove that his claims have a strong likelihood of success on the merits. While plaintiff is not required to prove his entire case at this juncture, "to establish success on the merits, a plaintiff must show 'more than a mere possibility of success.'" *Black v. Cincinnati Fin. Corp.*, No. 1:11-cv-2010, 2011 WL 1640962, at *2 (S.D. Ohio May 2, 2011) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (internal quotations omitted)). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. Of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

        **a. Fourteenth Amendment Procedural Due Process and ADA/Rehabilitation Act Claims**

"State universities must afford students minimum due process protections before issuing significant disciplinary decisions." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). *See also Doe v. Baum*, __ F.3d __, No. 17-2213, 2018 WL 4265634, at *3 (6th Cir. Sept. 7, 2018) (the Sixth Circuit has made clear that "if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension"). Suspensions or expulsions from school clearly implicate protected property interests. *Id.* Due process generally requires consideration of three distinct factors: (1) the nature of the private interest subject to official action; (2) the risk of erroneous deprivation under

6

the current procedures used, and the value of any additional or substitute procedural safeguards; and (3) the governmental interest, including the burden any additional or substitute procedures might entail. *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)). However, due process does not require that universities provide trial-like procedures. As the Sixth Circuit has explained:

> In the school-disciplinary context, an accused student must at least receive the following pre-expulsion: (1) notice of the charges; (2) an explanation of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker. *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 565-66 (6th Cir. 2011) (citing *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). We have recognized, however, that "disciplinary hearings against students . . . are not criminal trials, and therefore need not take on many of those formalities." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005). Although a university student must be afforded a meaningful opportunity to present his side, a full-scale adversarial proceeding is not required. *See id.* at 640. The focus, rather, should be on whether the student had an opportunity to "respond, explain, and defend," and not on whether the hearing mirrored a criminal trial. *Id.* at 635 (quoting *Gorman v. Univ. of R.I.*, 837 F.2d 7, 13 (1st Cir. 1988)).

*Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016). "If the hearing is live, the accused has a right to be present for all significant portions of the hearing." *Flaim*, 418 F.3d at 635. The Court must bear in mind that "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Pierre v. Univ. of Dayton*, No. 3:15-cv-362, 2017 WL 1134510, at *8 (S.D. Ohio Mar. 27, 2017) (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975)).

Plaintiff has not demonstrated a substantial likelihood of success on the merits of his procedural due process claim. Plaintiff was given notice of the academic misconduct charges against him, an explanation of the evidence, and requested and was afforded a hearing. (Ex. A-5, Doc. 6-6 at 1, 6-7). He was aware that the recommended sanction was dismissal from the University. (*Id.*). The University held a hearing on April 20, 2018, which plaintiff did not

7

attend. (*Id.* at 9). Plaintiff had notice of the hearing and a meaningful opportunity to present evidence in support of his claim denying responsibility for the academic misconduct, including the opportunity to present witnesses. (*Id.* at 7). Under the University's Student Code of Conduct, plaintiff also had the opportunity to submit a statement for the College Hearing Panel's review in the event he could not attend the hearing. (Student Code of Conduct § (B)(3)(b)(ii)(e), Ex. A-1, Doc. 6-2 at 27). Plaintiff also participated in the appeals process outlined in the Student Code of Conduct. The University thus gave plaintiff a "meaningful opportunity to present his side." *Flaim*, 418 F.3d at 635.

The University afforded plaintiff all the procedures required under the Due Process Clause of the Fourteenth Amendment. Plaintiff was given adequate notice and a meaningful opportunity to be heard, both at a hearing and on appeal. Although plaintiff claims he was unable to attend the hearing because of illness, his absence from the hearing cannot be attributable to defendants. Moreover, plaintiff has not presented any evidence that he notified any University official of the reason for his hearing absence prior to a final decision on his appeal. Plaintiff has failed to establish a substantial likelihood of success on the merits of his due process claim.

The Court must next address whether the University denied plaintiff a reasonable accommodation in violation of the Americans with Disabilities Act and Rehabilitation Act by declining to afford him a new academic misconduct hearing after he missed the April 20, 2018 hearing because of his alleged heart condition. The Court finds that plaintiff has not established a strong likelihood of success on the merits of his ADA and Rehabilitation Act claims for denial of a reasonable accommodation.

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794(a). "Apart from [§ 504's] limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)). Thus, claims brought under the Rehabilitation Act and ADA are generally reviewed under the same standards. *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015) (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010)).

Under the ADA, a plaintiff must show that: (1) he has a disability; (2) he is otherwise qualified; and (3) he was excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of his disability. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). Under § 504 of the Rehabilitation Act, a plaintiff must show that: (1) he is a "handicapped person" under the Act; (2) he is "otherwise qualified" for participation in the program; (3) he was excluded from participation in, or denied the benefits of, or subjected to discrimination under the program solely by reason of his handicap; and (4) the relevant program was receiving federal financial assistance. *G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 635 (6th Cir. 2013). The failure to provide reasonable accommodations can constitute

9

disability discrimination. *Peters v. Univ. of Cincinnati Coll. of Med.*, No. 1:10-cv-906, 2012 WL 3878601, at *8 (S.D. Ohio Sept. 6, 2012) (citing *Alexander v. Choate*, 469 U.S. 287, 295 (1985); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601, (1999); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). However, a student in an institution of postsecondary education must notify the University of his need for an accommodation and these institutions have no duty to identify students with disabilities. *Pierre*, 2017 WL 1134510, at *10 (citing authority from the U.S. Department of Education and cases stating that a student must request an accommodation for his disability). *See also Shaikh*, 608 F. App'x at 353 ("A publicly funded university is not required to provide accommodation to a student under the ADA or Rehabilitation Act until the student provides a proper diagnosis of his claimed disability and specifically requests an accommodation") (quoting *Carten v. Kent State Univ.*, 78 F. App'x 499, 500-01 (6th Cir. 2003)); *Buescher v. Baldwin Wallace Univ.*, 86 F. Supp.3d 789, 806 (N.D. Ohio 2015) ("It is the plaintiff's burden to show he requested an accommodation for his disability"). Courts must be mindful of the deference owed to "professional academic judgments when evaluating the reasonable accommodation requirement." *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 436 (6th Cir. 1998).

On April 20, 2018, the day of the academic misconduct hearing, plaintiff alleges that he had "violent chest pain" as a result of his heart condition and previous surgeries, which caused him to be absent from the hearing. (Qiu Affidavit at ¶ 11). Plaintiff testified that he did not seek medical treatment. Plaintiff did not immediately inform University personnel of the reason for his absence from the hearing or request that the hearing be rescheduled. (Schlagel Affidavit at ¶ 12). Plaintiff alleges that he requested and was unlawfully denied a reasonable accommodation in the form of a new hearing after he missed the first hearing as a result of his heart condition.

10

However, the evidence before the Court and plaintiff's testimony demonstrates that plaintiff did not request a new hearing until *after* the appeals process ended and the Provost issued a final decision dismissing plaintiff from the University on May 22, 2018. "The majority of federal courts agree that an after-the-fact accommodation request is not timely." *Pierre*, 2017 WL 1134510, at *10 (quoting *Shaikh v. Lincoln Mem'l Univ.*, 46 F. Supp.3d 775, 786 (E.D. Tenn. 2014), *aff'd*, 608 F. App'x 349 (6th Cir. 2015)).

Plaintiff had several opportunities to request a new hearing before the University issued its final decision. After receiving notice of the hearing decision, on April 25, 2018, plaintiff emailed Aniesha K. Mitchell, Director of Student Conduct and Community Standards, and inquired about the appeals process. Plaintiff informed her that he would like to "appeal the final decision" and receive another hearing "to clarify the truth." (Ex. A-6, Doc. 6-7 at 1-3). Plaintiff did not mention that his disability prevented him from attending the first hearing. Plaintiff formally appealed the hearing panel's decision on May 3, 2018. (*Id.* at 4). In his appeal statement, plaintiff denied the academic misconduct allegations, but he again did not request a new hearing as a result of his disability. (*Id.*). Plaintiff also testified that the University was not aware of his need for an accommodation until after May 22, 2018, the date the final decision was issued. Plaintiff testified that he spoke with Dean Scott Lipscomb after May 22, 2018. Plaintiff subsequently met with Dean Stephanie Schlagel during the week of May 22, 2018. (Ex. A-7, Doc. 6-8 at 2-3). Again, the University's knowledge of plaintiff's need for an accommodation came after the May 22, 2018 final decision.

Plaintiff alleges that the University had records of his heart condition and was aware that he had previously collapsed in the orchestra rehearsal room. However, general knowledge of a medical condition is not sufficient to give the University notice that he was experiencing chest

11

pain on the date of the hearing such that he needed an accommodation in the form of a new hearing. This is especially true where, as here, plaintiff made no effort to inform university personnel of his need for an accommodation until a month after the initial hearing and after the Provost issued the final decision dismissing him from the University. Accordingly, because plaintiff was dilatory in requesting a reasonable accommodation, he has not established a substantial likelihood of success on the merits on his ADA or Rehabilitation Act claims. *See Pierre*, 2017 WL 1134510, at *10.

### b. National Origin, Race, and Color Discrimination/State Law Claims

Plaintiff brings claims for "national origin, race, [and] color discrimination" against all defendants under 42 U.S.C. § 1981, which "prohibit[s] racial discrimination in the making and enforcement of contracts." *McCormick v. Miami Univ.*, 693 F.3d 654, 659 (6th Cir. 2012). "Ohio law treats the relationship between a university and its students as contractual in nature." *Reeves v. Shawnee State Univ.*, No. 1:16-cv-765, 2018 WL 582555, at *8 (S.D. Ohio Jan. 29, 2018) (citing *Al-Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 359 (6th Cir. 2015)). Plaintiff contends he has established a likelihood of success on the merits of his discrimination claims. (Doc. 2 at 4-5).

A plaintiff may prove intentional discrimination by either direct evidence or by indirect evidence using the *McDonnell Douglas* burden-shifting scheme. *See Bell v. Ohio State Univ.*, 351 F.3d 240, 252-53 (6th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Plaintiff has failed to present any admissible direct evidence of discrimination against him by defendants. The sole evidence on this point is contained in plaintiff's affidavit submitted in support of his motion for temporary restraining order, which states in relevant part:

> I have been wrongfully accused and dismissed for no reason by Prof. Losada but because she does not like me for who I am, an international student from China.

12

> Prof. Losada has a history of mistreating foreign students from China and Taiwan (Chinese ancestry and culture). I can name 2 specific students who suffered the same treatment as I have - (a) You Yang - flute major graduated from CCM UC and now studying Master degree in New England Conservatory of Music, Boston, MA. She was accused of cheating on homework using the instructor's manual in 2014 but I believe she survived because it was during the tenure of President Santa Ona (2012-2016) and Prof. Losada was afraid, and (b) Yi-Chan Hu, violin major and junior at CCM UC who was accused of cheating for 6 times in the same course. He failed her class and is now is majoring in physics and only takes some classes at CCM. He never passed Losada and will never get a degree in music from CCM because Music Theory 2 is required for the degree.
>
> The Chinese students talk about 13 more victims of Prof. Losada. . . .

(Qiu Affidavit at ¶¶ 14-16). Plaintiff's allegations that Professor Losada accused him of cheating because she does not like him and because he is an international student from China are conclusory and speculative. Plaintiff has not submitted any evidence establishing a factual basis for his contention that his race or national origin was a motivating factor in Professor Losada's actions or the actions of any other University officials. In addition, to the extent plaintiff may be alleging a pattern or practice of discrimination on the part of Professor Losada, his allegations rest on hearsay evidence and innuendo which are not admissible. Moreover, plaintiff has produced no evidence to show that any University decision-maker was aware of any alleged discriminatory animus on the part of Professor Losada and relied on or was influenced by such animus in deciding to dismiss plaintiff from the University. Plaintiff's direct evidence of discrimination is insufficient to show he has a substantial likelihood of success on the merits of his discrimination claim.

Under the *McDonnell Douglas* indirect evidence method of proof, plaintiff can establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he suffered an adverse action at the hands of the defendants in the pursuit of his education; (3) he was qualified to continue in the pursuit of his education; and (4) he was treated differently from

13

similarly situated students who are not members of the protected class. *Bell*, 351 F.3d at 253 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (noting that a plaintiff may substitute for the fourth element in the typical *McDonnell Douglas* framework evidence that similarly situated individuals outside the protected class received better treatment than he)). Plaintiff has presented evidence to show he is Chinese, he was otherwise qualified for the CCM program, and he suffered an adverse action when he was dismissed from the University. *Bell*, 351 F.3d at 253. However, plaintiff has presented no evidence whatsoever to show that he was treated differently than a similarly-situated person outside his protected class. *See Bell*, 351 F.3d at 253-54 (stating that the plaintiff did not establish that a student was a comparator when the plaintiff did not know facts about the student's name, race, or the clinical rotation for which the student had been permitted to take a make-up examination). Plaintiff argues in his motion for temporary restraining order that he "can show that Defendants continued to pass other students in Losada's Music Theory 2." (Doc. 2 at 4). Whether plaintiff may be able to adduce such evidence in the future is not sufficient to meet his burden in support of his motion for temporary restraining order. *See Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 1179955, at *8 (S.D. Ohio Mar. 13, 2015) ("Plaintiff has the burden of proving that a TRO is warranted, and that he is substantially likely to succeed on the merits of his claim, *now*."). Plaintiff has not met his heavy burden of showing a substantial likelihood of success on his national origin, race, and color discrimination claims at this juncture of the proceedings.[4] *See Marshall*, 2015 WL 1179955, at *8 ("Plaintiff must establish that he has a substantial likelihood of success on the merits of his claim, a standard much more demanding than that required to survive a motion to dismiss or even summary judgment.") (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).

---

[4] The Court need not address the other burden-shifting prongs of the *McDonnell Douglas* analysis as plaintiff has failed to establish even a prima facia case of discrimination at this juncture.

Plaintiff has also failed to establish a substantial likelihood of success on his claims under 42 U.S.C. § 2000e and Ohio Rev. Code § 4112.02. (Doc. 1 at ¶ 56). Both of these statutory provisions govern discrimination in employment, and plaintiff has not alleged he was employed by the University or that he suffered an adverse action in relation to his employment with the University.

Plaintiff has failed to establish a substantial likelihood of success on his remaining state law claim of intentional infliction of emotional distress because this claim is barred by the Eleventh Amendment. The Eleventh Amendment "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens." *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (citation omitted). "It is well-established that the University of Cincinnati is an arm of the State of Ohio and entitled to Eleventh Amendment sovereign immunity." *Al-Maqablh v. Univ. of Cincinnati Coll. of Med.*, No. 1:11-cv-531, 2012 WL 6675761, at *2 (S.D. Ohio Dec. 21, 2012) (citing *Thomson v. Harmony*, 65 F.3d 1314, 1319 (6th Cir. 1995); *Dillion v. University Hosp.*, 715 F. Supp. 1384, 1386-87 (S.D. Ohio 1989)). Likewise, plaintiff's claims against defendants Pinto and Losada in their official capacities are "no different from a suit against the State itself" and are included in this immunity. *Doe v. Ohio State Univ.*, 219 F. Supp.3d 645, 654 (S.D. Ohio 2016) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).[5] Accordingly, plaintiff's state law claims provide no basis for injunctive relief in this case.

---

[5] In any event, any alleged violation of this state law claim would be compensable by money damages and therefore any harm to plaintiff would not be irreparable. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992); *Southern Milk Sales, Inc., v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991).

## B. Irreparable Harm

Plaintiff must next demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

Plaintiff alleges that without emergency injunctive relief permitting him to reenroll at the University for the fall 2018 semester, he will lose his I-20 status at the University and F-1 student visa, which will result in removal proceedings against him and his inability prosecute this lawsuit. (Doc. 2 at 6). Plaintiff also argues that the Court should consider irreparable harm to his reputation, health, education, and future career as a violinist. (*Id.* at 7).

In response, the University argues that it shoulders no responsibility for plaintiff's failure to take steps to maintain valid nonimmigrant status. (Doc. 6 at 11). The University contends that if plaintiff falls out of status, he can depart the United States, he can apply for F-1 reinstatement at a different school, or he can explore other options to maintain valid nonimmigrant status beyond seeking reenrollment. (*Id.*).

The Court is unable to conclude that plaintiff has met his burden of showing he will suffer actual and imminent harm if a temporary restraining order is not granted. He has not presented evidence showing that removal proceedings and deportation are imminent or that enrollment in the University of Cincinnati's CCM program is the only way he can maintain his valid nonimmigrant status. Plaintiff has failed to present any evidence that he has explored alternative options to maintain valid nonimmigrant status beyond seeking reenrollment at the University and that such options are not viable to maintain valid nonimmigrant status.

Moreover, even if the Court were to agree that plaintiff would suffer irreparable harm in the absence of emergency injunctive relief, injunctive relief is not warranted on this basis alone

16

because the Court has already found that plaintiff has not shown a strong likelihood of success on the merits on his claims. *See Gonzales*, 225 F.3d at 625.

## C. Harm to Others and Public Interest

The Court concludes that the remaining two factors weigh in favor of the University. The Court cannot accept plaintiff's argument that the University will suffer "no harm" by the issuance of a TRO. The University has the statutory authority to adopt rules and procedures governing its student body and the institution as a whole. Ohio Rev. Code § 3361.03. Issuing a TRO and allowing plaintiff to reenroll after he was found responsible under well-founded misconduct procedures would undermine the institution's critical role in preserving academic integrity and enforcing disciplinary standards. Harm would also result to faculty, students, and the community as a whole, all of whom rely on the University to uphold academic standards in order to maintain its status as an esteemed institution. Granting a TRO "would likely disturb the University's ability to enforce its disciplinary procedures," which would not be in the public interest. *Doe v. Univ. of Cincinnati*, No. 1:15-cv-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) (citing *Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015)). Plaintiff is correct that there is a strong public interest in the protection of constitutional rights and combatting discrimination; however, he has failed to demonstrate a substantial likelihood of success on the merits on these claims. Accordingly, plaintiff cannot show that a TRO would not result in harm to others or that it would serve the public interest.

## IV. Conclusion

Upon consideration of the above factors for injunctive relief, the Court finds that plaintiff has not demonstrated a substantial likelihood of success on the merits on his Fourteenth Amendment procedural due process, ADA, Rehabilitation Act, national origin, race, and color

17

discrimination, and state law claims. The Court also finds that the "harm to others" and "public interest" factors weigh against the issuance of a TRO. Accordingly, plaintiff's emergency motion for a temporary restraining order (Doc. 2) is **DENIED**.

**IT IS SO ORDERED.**

Date: 9/19/18

Karen L. Litkovitz
United States Magistrate Judge